UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Bridget Gross,                                     File No. 20-cv-377 (ECT/KMM)

                   Plaintiff,

v.

                                                   **OPINION AND ORDER**

Eaton Corporation,

                   Defendant.

Patrick W. Kramer and Stephen J. Fields, Fields Law Firm, Minnetonka, MN for Plaintiff Bridget Gross.

Jennifer A. Nodes, Jackson Lewis P.C., Minneapolis, MN and Patrick O'Keefe Peters and Michelle Hackim, Jackson Lewis P.C., Cleveland, OH for Defendant Eaton Corporation.

In this ERISA lawsuit, Plaintiff Bridget Gross seeks to recover long-term disability benefits under an employee welfare benefit plan (the "Plan") sponsored by her employer, Defendant Eaton Corporation, and administered by non-party Sedgwick.[1]  Sedgwick denied Gross's benefit claim after determining that her disability was due to a preexisting condition, a limitation the Plan imposed on the payment of benefits.  Gross and Eaton have filed cross-motions for summary judgment, and the dispositive issue is whether the denial of Gross's claim as a preexisting condition was an abuse of discretion.  The denial of Gross's claim on this basis was supported by substantial evidence and therefore was not an

---

[1] Eaton does not argue that it is an improper party or that Sedgwick is a necessary party.  In other words, Gross and Eaton evidently agree that Gross's claims in this case may be fully adjudicated between just them.

abuse of discretion.  Eaton's summary-judgment motion will be granted, and Gross's motion will be denied.

I[2]

A

As with many ERISA disability benefit claims, Gross's relevant medical history is fact intensive.  To put that history in context, it helps to start where Gross's claim ended: the Plan's preexisting condition limitation.  That is the sole basis on which her claim was denied.[3]

The Plan provided that it would not cover or pay benefits if a "disability is the result of . . . [a] preexisting condition, or related to a preexisting condition, if the disability starts within the 12-month period after the date [a participant's] long term disability coverage becomes effective."  AR 341.  Separately, the Plan included a provision entitled "**Preexisting Condition Limitation**" that read, in relevant part, as follows:

> You will not be covered under the Plan if, within 12 months of the initial effective date of your coverage, you become disabled

[2]    The facts are taken from the stipulated administrative record filed by Eaton.  *See* Nodes Decl., Exs. 1–8 [ECF Nos. 28–35].  Citations to documents in the administrative record appear with the prefix "AR" followed by the page number affixed by the Parties (appearing usually in the bottom right corner of each page and beginning with the prefix "AR").  Unless otherwise indicated, the facts are undisputed.

[3]    In its final decision, Sedgwick wrote that "the documentation does not support a currently impairing condition during the period of review[,]" suggesting that the denial of Gross's claim also was based on Sedgwick's determination that Gross was not disabled. AR 542.  The better understanding is that Sedgwick did not deny Gross's claim on this basis.  The quoted passage stands in isolation; it is the only time Sedgwick mentions the issue of whether Gross is disabled.  The ultimate reason Sedgwick gives for its decision concerns only the preexisting condition issue.  *See* AR 542.  And in this case, Eaton defends the denial of Gross's claim only on the basis of the preexisting condition limitation.

> due to a preexisting condition. A preexisting condition is any physical or mental condition, regardless of cause, for which medical advice, diagnosis, care or treatment was recommended or received within the six-month period immediately before your Long Term Disability Plan coverage became effective. This limitation does not apply to a period of disability resulting from an injury that occurs or a sickness that begins after your Long Term Disability Plan coverage becomes effective.

\*      \*      \*

AR 342. To summarize, then, the Plan's preexisting condition limitation requires consideration of Gross's medical history to the extent it might concern the cause of her disability during two periods—"the six-month period immediately before" the day Gross's coverage began (also known as the "look-back period"), and the 12-month period after Gross's coverage began. *Id.*

Gross began working for Eaton on November 6, 2017; her coverage under the Plan began that same day. AR 925; *see* Def.'s Mem. in Supp. at 6 [ECF No. 26]; Pl.'s Mem. in Supp. at 8 [ECF No. 20] (accepting November 6, 2017 as benefit effective date).[4] Therefore, the six-month look-back period ran from May 5, 2017, to November 5, 2017, and the twelve-month period after Gross's coverage began would have ended November 6, 2018. Though the precise cause of Gross's disability is the subject of dispute, it seems fair to say at least that her benefit claim resulted from the condition of her knees, particularly her right knee.

---

[4]      Gross was employed as a "test operator," AR 989, a position that involved frequent physical activities, *see* AR 538.

B

Gross received extensive medical care and treatment for her right knee during the six-month look-back period immediately preceding her effective date of coverage under the Plan, including total knee replacement surgery (or "knee arthroplasty") in June 2017. To put things in context, it helps to review Gross's medical records that describe her treatment leading up to the look-back period. Documents in the administrative record show that Gross sought medical care for pain in her right knee at least as early as January 2017. An MRI on January 24, 2017, showed "some degenerative arthritis" in Gross's right knee. AR 662, 700, 702. The report of the MRI also described Gross as having had "chronic pain for years" but "no specific trauma." AR 700. On March 23, Dr. David Austin, an orthopedic surgeon, performed a diagnostic arthroscopy on Gross's right knee to identify the cause of her pain. AR 662–63. Based on this procedure, Dr. Austin diagnosed Gross with a "[p]osterior horn medial meniscus tear [and] degenerative arthritis medial and patellofemoral compartment." *Id.* On May 3, 2017, Dr. Austin and physician assistant (or "P.A.") James McAllister examined Gross in follow-up to the arthroscopy. AR 748–52. At that appointment, Gross reported that her right knee had not improved and that she experienced pain on a daily basis. AR 748. After discussing treatment options, Gross chose to proceed with total right-knee replacement surgery. AR 751.

Dr. Austin performed the surgery within the look-back period on June 27, 2017, to treat "degenerative joint disease of [Gross's] right knee." AR 721–22.[5] Gross also had

---

[5]     Not quite four years earlier, on August 26, 2013, Gross had surgery to replace her left knee. *See* AR 729.

several post-surgical follow-up appointments during the look-back period.  Following an appointment on July 11, 2017, Dr. Austin recorded that Gross had swelling in her right knee and moderate to severe pain but was "slowly improving."  AR 759–60.  A July 19 x-ray of Gross's right knee showed a "[w]ell aligned right knee arthroplasty with no hardware complication evident."  AR 661.  On July 20, Gross returned to Dr. Austin "due to a small area of drainage from the incision" and for a refill of her prescription for pain medication.  AR 761–65.  During his July 20 examination, Dr. Austin noted that Gross showed no signs of infection.  AR 764.  Following an August 3 examination, P.A. McAllister noted that Gross was "doing well" post-surgery and that, though she experienced some pain at night, her pain was "well controlled" overall; P.A. McAllister released Gross to return to work on August 14 with no restrictions.  AR 667–68, 766–68.  In a note documenting an August 25 examination, Dr. Austin wrote that Gross was experiencing mild pain and swelling in her right knee and that her symptoms were gradually improving.  AR 769–71.  Dr. Austin recommended that Gross need not return to him for a follow-up and x-ray until June 2018.  AR 771.  However, Gross returned soon after, on September 6, complaining that her knee was continuing to bother her and that she was experiencing splitting and draining of her incision.  AR 772–75.  Dr. Austin performed an aspiration on Gross's right knee to rule out infection.  AR 774.  The results of that procedure were normal.

C

During the late spring and summer of 2018—within twelve months after her November 6, 2017 start date with Eaton and effective date of her coverage under the Plan—Gross's medical records describe more issues with her knees, but especially her right knee.

These issues caused her to take a disability leave beginning June 8, 2018.  Gross underwent an x-ray of both her knees on May 14, 2018, and a report of the x-ray noted that Gross had a history of "pain [in] both knees" and was "[status post] total [bilateral knee arthroplasties]."  AR 666.  The x-ray showed "no radiographic findings of loosening or fracture," "no definite evidence of osteolysis,"[6] and "no acute fracture or dislocation."  *Id.* On June 8, Gross saw Dr. Austin for a follow-up "for knee pain [status post] bilateral total knee arthroplasty, mostly activity related."  AR 1329–31.  In his note documenting this examination, Dr. Austin wrote that Gross's pain "started after returning to [her] factory job."  AR 1329.  Dr. Austin listed three diagnoses based on his clinical impressions: "[s]tatus post total bilateral knee replacement," "[p]ain in both knees [of] unspecified chronicity," and "[k]nee pain, bilateral."  AR 1331.  Dr. Austin and Gross discussed a "work up for prosthetic loosening with aspiration," a CT scan if Gross's pain persisted, and follow-up appointments as needed if Gross's symptoms worsened.  *Id.*  That same day, Gross began her disability leave because of what she described as "Chronic Pain due to knee replacements in 2013 and 2017."  AR 1140.

Gross's medical care for her right knee continued after she commenced her leave. On July 13, 2018, Dr. Austin examined Gross for "a follow up for bilateral knee pain, [r]ight worse."  AR 1302–1305.  In his progress notes, under a heading titled "Chief Complaint," Dr. Austin wrote that Gross presented with "Surgical Followup [status post right total knee replacement] (6/27/17), [left total knee replacement] (8/26/13)."  AR 1302.

---

[6]      "Osteolysis" is the "[s]oftening, absorption, and destruction of bony tissue[.]" *Stedman's Medical Dictionary* 1390 (28th ed. 2006).

Dr. Austin noted that Gross's knee pain had "progressed to a point and plateaued" and that her symptoms were "better when not working." *Id.* Dr. Austin diagnosed Gross with chronic right-knee pain, chronic pain of both knees, and a history of bilateral total knee replacement. AR 1304. Dr. Austin administered a lidocaine injection in Gross's right knee and gave her "a prescription for out of work for one month" and a referral for a functional capacity evaluation. *Id.*; AR 1310. On August 2, 2018, doctors performed a CT scan of Gross's right knee. AR 664. The imaging report described Gross as having "Knee pain, persistent, >=6wks: Post knee replacement pain." *Id.* The scan showed "evidence of osteolysis at [the] cement-bone interface of the tibial component in the medial compartment, measuring up to 3 to 4 mm in thickness." *Id.* At an August 10 appointment, Dr. Austin discussed with Gross the finding from the CT of "osteolysis at [the] tibia without loosening" and the possibility of a revision surgery on Gross's artificial right knee to address the problem. AR 672. In his progress notes of this appointment, Dr. Austin (again) listed Gross's "Chief Complaint," as "Surgical Followup [status post right total knee replacement] (6/27/17), [left total knee replacement] (8/26/13)" and noted that her symptoms had plateaued. AR 670. Dr. Austin listed two conditions under his diagnostic impressions: status post total right knee replacement and chronic pain of right knee. AR 672. Dr. Austin performed the revision procedure on October 18, 2018. AR 725–26; *see* AR 709–10. He diagnosed Gross as having suffered the failure of her right knee prosthesis. AR 725.

D

Gross applied for long-term disability benefits on January 31, 2019.  AR 989–90.
To be eligible for benefits, the Plan required, among other things, that Gross have been
prevented by a "covered disability . . . from working for longer than 26 weeks."  AR 341;
*see* AR 344 ("Long term disability benefit payments begin on the day immediately
following a six-month period during which you have been absent from work due to a
covered disability.").   For purposes of Gross's claim, the Plan defined a "covered
disability" as one that made Gross, during at least the initial six-month eligibility period
and for up to 23 months after that, "[t]otally and continuously unable to perform the
essential duties of [her] regular position or any suitable alternative position with [Eaton]."
AR 341.  Gross sought benefit payments beginning February 18, 2019.[7]  On her application
form, Gross identified the date of her disability's onset (or her date of disability) as
"6/2018," and identified the "cause" of her disability as "6-18 & Total Knee replacement
[and] revision on 10/18/18."  AR 989.  As of December 2018, Dr. Austin identified his
"primary diagnosis" generally as Gross's status following the revision of her right-knee
replacement.  AR 1220.  In a form submitted to Sedgwick, he wrote that he first treated

---

[7]      It isn't clear why the period for which Gross claims benefits begins on February
18, 2019.  Six months after June 8, 2018 would fall on or near December 8, 2018.  The
most likely possibility seems to be that, for whatever reasons, Gross did not exhaust her
short-term disability benefits until mid-February, and the Plan required exhaustion of these
short-term benefits as an additional eligibility requirement for the receipt of long-term
disability benefits.  *See* AR 341.  Whatever the reasons, Gross and Eaton agree that
February 18, 2019, would be the correct start date for Gross's long-term disability benefit
payments, if approved, and there is no reason to question the Parties' agreement on this
issue.

Gross "for this current impairment episode" on July 13, 2018, but also noted that he had treated Gross "for this impairment prior to this episode" in June 2017. *Id.*

Sedgwick initially denied Gross's claim in a letter dated February 26, 2019. AR 912–13. The letter quoted from the Plan's preexisting condition limitation provisions, identified the cause of Gross's disability as "complaints of bilateral knee pain status post bilateral knee arthroplasties," and noted that Gross "underwent a right knee arthroplasty during the pre-existing period [of] May 5, 2017 thru [sic] November 5, 2017." AR 912. Therefore, Sedgwick concluded, Gross "ceased working due to a preexisting medical condition." *Id.*

Gross lodged an administrative appeal of Sedgwick's initial denial on March 2, 2019. AR 733–36. In her appeal, Gross argued essentially that the October 2018 revision surgery was necessary to treat osteolysis, that osteolysis was therefore the cause of her disability, and that osteolysis had not been discovered until August 2018, well after she was first covered under the Plan. AR 733. In other words, Gross seemed to say that she could not have received medical care or treatment for osteolysis during the six months immediately preceding her effective date of coverage under the Plan because she was not diagnosed with the condition until roughly nine months after she started working at Eaton and became covered under the Plan, and therefore it could not have been a preexisting condition.

Sedgwick upheld its initial denial on March 21, 2019. AR 845–47. Sedgwick explained: "[a] review of your file notes you stopped working on June 8, 2018 due to complaints of bilateral knee pain status post bilateral knee arthroplasties. The left knee

arthroplasty was completed on August 26, 2013 [sic] and the right was completed on June 27, 2017[,]" meaning the right knee arthroplasty occurred within the six months preceding Gross's effective date of coverage under the Plan.  AR 846.  Sedgwick concluded by explaining that, "[s]ince the medical documentation confirms you stopped working due to a pre-existing medical condition, as defined by the Plan . . ., we have no alternative other than to reaffirm the denial of benefits[.]"  *Id.*

Gross retained counsel and filed a second appeal on September 12, 2019.  AR 1468–1490.  In this second appeal, Gross's counsel elaborated on the position Gross herself advanced in her first appeal, writing:

> The medical records indicate that the Claimant had a successful knee surgery and was capable of returning to work.  Months later she was suffered [sic] a loosening of the tibial component of her knee.  This was not a condition for which the Claimant received medical advice, diagnosis, care or treatment was recommended or received [sic] within the six-month period prior to her effective date of insurance.
>
> The condition for which the Claimant required surgery was a posterior horn medial meniscus tear, degenerative arthritis of the medical [sic] and patellofemoral compartment.  These conditions are neither expressly stated in the records subsequent to the Claimant leaving work nor are they even referenced.
>
> The condition that is noted after the claimant left work was a loosening of the tibial component of her knee.  The simple fact that this involves her knee is not sufficient to state that this condition is pre-existing per the policy.

AR 1474–75.

In response to Gross's second appeal, Sedgwick obtained a medical-record review from Victor Marwin, M.D., an orthopedic surgeon.  AR 558–562.  Sedgwick asked Dr.

10

Marwin to answer several questions, including whether he believed "that the currently disabling condition resulted, directly or indirectly, from an illness or injury for which the claimant sought or had symptoms or conditions which would cause a reasonable person to seek diagnosis, treatment, or care between the dates of 05/01/2017 through 11/06/2017[.]" AR 561. In response to this question, Dr. Marwin described Gross's June 2017 surgery and post-operative care and noted that she "was seen and treated during 05/01/2017 through 11/06/2017 for right knee pain status post[-surgery]." *Id.* Dr. Marwin further noted that Gross "was subsequently treated with revision total knee arthroplasty in October 2018 for a painful and loose total knee arthroplasty that was originally performed on June 27, 2017[,] however loosing, the reason for the revision was not noted until August 2, 2018[.]" *Id.* As part of his review, Dr. Marwin attempted on three different dates to speak with Dr. Austin and P.A. McAllister, asking them to return his telephone calls, but neither Dr. Austin nor P.A. McAllister responded to Dr. Marwin. AR 559. Separately, Sedgwick provided Dr. Marwin's report to Gross's counsel and suspended its review of Gross's claim for 21 days to allow counsel to respond. AR 563. Neither Gross nor her counsel submitted a response to Dr. Marwin's report.

Sedgwick issued its final decision denying Gross's claim on November 15, 2019. AR 541–43. As with its two previous decisions, Sedgwick identified the cause of Gross's disability as "complaints of bilateral knee pain status post bilateral knee arthroplasties." AR 542. Sedgwick described the evidentiary basis for its decision in a lengthy paragraph that read as follows:

> The determination to deny is based on a review of the medical documentation in the file. Ms. Gross stopped working on June 08, 2018 due to complaints of bilateral knee pain status post bilateral knee arthroplasties. Ms. Gross underwent a right total knee replacement on June 27, 2017. She followed up on July 20, 2017 and was noted to have a small open area of granulation tissue otherwise normal examination. On August 3, 2017, she followed up again and was noted to have range of motion from 0 to 100, small open area of the incision without any signs of infection. Otherwise, she was doing well. On August 25, 2017, she followed up again it was noted to have range of motion from 0 to 110 in the knee otherwise normal examination. On September 6, 2017, she stated her incision split open and began to drain yellow fluid. Range of motion remained the same. Aspiration was performed to rule out infection. No other records during this time period available for review. Ms. Gross was seen and treated during May 01, 2017 through November 06, 2017 for right knee pain status post. Ms. Gross was subsequently treated with revision total knee arthroplasty in October 2018 for a painful and loose total knee arthroplasty that was originally performed on June 27, 2017 however loosing. The reason for the revision was not noted until August 02, 2018 and the documentation does not support a currently impairing condition during the period of review of February 18, 2019 through April 22, 2019.

AR 542. Except for the first two sentences, this paragraph is taken verbatim from Dr. Marwin's report—specifically that part of the report in which he responds to Sedgwick's question whether Gross's disabling condition resulted from a preexisting condition. *Compare* AR 542 *with* AR 561. Based on this "medical documentation," Sedgwick concluded essentially that Gross's disability (her knee pain) was "due to a pre-existing medical condition" (her status following her June 2017 right-knee replacement surgery). AR 542.

E

Gross commenced this action on January 28, 2020, asserting a claim under the civil enforcement provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  Compl. at 6, ¶ 2 [ECF No. 1].  Gross also seeks attorneys' fees and costs under ERISA's fee-shifting provision, 29 U.S.C. § 1132(g)(1). *Id.* ¶ 22, and at 8, ¶ 7.  Should her summary-judgment motion be denied, Gross alternatively requests that her claim be remanded to Sedgwick "for proper review[.]"  Pl.'s Mem. in Supp. at 14.

II

A

Suits brought under § 1132(a)(1)(B) to recover benefits allegedly due to a participant are reviewed de novo unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the plan grants the administrator such discretion, then "review of the administrator's decision is for an abuse of discretion."  *Johnston v. Prudential Ins. Co. of Am.*, 916 F.3d 712, 714 (8th Cir. 2019) (quoting *McClelland v. Life Ins. Co. of N. Am.*, 679 F.3d 755, 759 (8th Cir. 2012)).  This standard of review is "highly deferential."  *Wise v. Kind & Knox Gelatin, Inc.*, 429 F.3d 1188, 1191 (8th Cir. 2005).  Here, Gross and Eaton agree that the Plan gave Sedgwick "discretionary authority to determine eligibility for benefits and to construe any and all terms of the Plan, including but not limited to any disputed or doubtful terms."  Def.'s Mem. in Supp. at 11–12 (quoting

AR 372); Pl.'s Mem. in Supp. at 7.  Gross agrees that, "[f]or this reason, the applicable standard of review is abuse of discretion."  Pl.'s Mem. in Supp. at 7.

The Eighth Circuit applies two distinct tests to determine whether a benefits determination was reasonable and not an abuse of discretion.  First, to determine whether an administrator's interpretation of plan terms was reasonable, the court applies the five-factor test from *Finley v. Special Agents Mutual Benefit Association*, 957 F.2d 617, 621 (8th Cir. 1992).  *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (en banc); *see also id.* at 1014 (Gruender, J., dissenting).  The five factors to be considered ask whether the administrator's interpretation: (1) is consistent with the goals of the plan; (2) renders any language of the plan meaningless or internally inconsistent; (3) conflicts with ERISA; (4) is consistent with the administrator's prior determinations regarding the terms at issue; and (5) is contrary to the clear language of the plan.  *Peterson v. UnitedHealth Grp. Inc.*, 913 F.3d 769, 775–76 (8th Cir. 2019).  "While these non-exhaustive factors 'inform our analysis,' the ultimate question remains whether the plan interpretation is reasonable."  *Id.* at 776 (quoting *King*, 414 F.3d at 999).  Second, to determine whether an administrator reasonably applied its interpretation to the facts of any particular case, the test is whether the decision is "supported by substantial evidence."  *Johnston*, 916 F.3d at 714 (quoting *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011)).  "Substantial evidence is more than a scintilla but less than a preponderance."  *Johnston*, 916 F.3d at 714 (quoting *Green*, 646 F.3d at 1050); *see also Jones v. Aetna Life Ins. Co.*, 856 F.3d 541, 547–48 (8th Cir. 2017) (citations omitted) (same).

Other considerations are relevant to both tests.  "If an administrator also funds the benefits it administers . . . the district court 'should consider that conflict as a factor' in determining whether the administrator abused its discretion."  *Jones*, 856 F.3d at 548 (quoting *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 718 (8th Cir. 2014)).  "A decision supported by a reasonable explanation . . . should not be disturbed, even though a different reasonable interpretation could have been made."  *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 832–33 (8th Cir. 2014) (alteration in original) (citation and internal quotation marks omitted), *as corrected* (July 15, 2014); *see also Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797, 805 (8th Cir. 2014) ("We must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." (citation and internal quotation marks omitted)).  "[A] reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales."  *Waldoch*, 757 F.3d at 829–30 (citation and internal quotation marks omitted).  "Courts reviewing a plan administrator's decision to deny benefits will review only the final claims decision, and not the 'initial, often succinct denial letters,' in order to ensure the development of a complete record."  *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010) (citing *Galman v. Prudential Ins. Co. of Am.*, 254 F.3d 768, 770–71 (8th Cir. 2001); *Wert v. Liberty Life Assurance Co. of Boston*, 447 F.3d 1060, 1066 (8th Cir. 2006)).

## B

Two issues that Gross and Eaton identify in their pleadings and motion papers have been cleared away.  *First*, though Gross alleged in her complaint that Eaton operated under

15

a conflict of interest when it adjudicated her claim, Compl. ¶ 9, Gross has since abandoned this contention. Gross did not advance this position in her summary-judgment papers. *See* Pl.'s Mem. in Supp.; Pl.'s Reply Mem. [ECF No. 41]; Pl.'s Mem. in Opp'n [ECF No. 39]. Eaton refuted Gross's conflict-of-interest allegations in its principal brief, explaining: "Although Eaton does fund the Plan, Sedgwick as the Claims Administrator (an entity with no financial interest in the outcome of Plaintiff's claim under Eaton's self-funded plan) decides whether participants will receive benefits under the Plan." Def.'s Mem. in Supp. at 12. Eaton explained further that no conflict of interest exists because "[t]he Plan includes an impartial claims procedure requiring Sedgwick to make the initial determination of whether a participant is eligible for LTD Plan benefits, as well as make determinations on first and second level appeals if LTD benefits are denied." *Id.* At the hearing on the Parties' motions, Gross's counsel did not challenge these assertions, explained that the conflict-of-interest allegations in Gross's complaint were incorrect and based on a misunderstanding of the Plan's structure, and acknowledged that Gross no longer advances the argument that Eaton operated under a conflict of interest. *Second*, though in its briefs Eaton cited *Finley* and argued that Sedgwick's interpretation of Plan terms was reasonable, *e.g.*, Def.'s Mem. in Supp. at 16–19, Sedgwick's final decision does not seem to have defined any Plan terms, either explicitly or implicitly, and the Parties agreed at the hearing that their motions implicate no plan-interpretation question under *Finley*.

The dispositive issue, then, boils down to whether Sedgwick's denial of Gross's claim as a preexisting condition was supported by substantial evidence in the administrative record. It was.

16

The record supports Sedgwick's determination that Gross "stopped working on June 8, 2018 due to complaints of bilateral knee pain status post bilateral knee arthroplasties." AR 542. That is essentially how Gross described the cause of her disability. In her original application for short-term disability benefits—which also is the first date of the six-month eligibility period for her long-term disability benefits claim—Gross identified the diagnosis prompting her disability as "Chronic Pain due to knee replacements in 2013 & 2017," and described her symptoms as "Extreme Pain legs, knees[,] feet, Swelling (right is worst)[.]" AR 1140. That also is how Gross's medical providers described her condition in records close to the time she stopped working. In a report of a May 14, 2018 x-ray, Dr. Patrick Dyer noted that Gross suffered from "pain [in] both knees." AR 666. Dr. Dyer described Gross's pain as "sp [or status-post] total," evidently intending to connect her pain to her total knee replacement surgeries. *Id.* And in a note describing a July 13, 2018 examination, Dr. Austin described Gross as suffering from "bilateral knee pain, Right worse." AR 1302. Like Dr. Dyer, Dr. Austin also tied Gross's condition to her status as a recipient of "bilateral total knee arthroplasty, Right 6/27/17, Left 8/26/13." *Id.* In the section of his note labeled "IMPRESSION," Dr. Austin recorded that Gross suffered from three conditions: "Chronic pain of right knee[,]" "Chronic pain of both knees[,]" and "History of total knee replacement, bilateral[.]" AR 1304. To summarize, because Gross and her medical providers consistently described the cause of her disability as pain in both of her knees, particularly her right knee, owing to her status as a recipient of artificial knees, it was reasonable for Sedgwick to conclude that Gross's disability was due to "complaints of bilateral knee pain status post bilateral knee arthroplasties." AR 542.

Sedgwick also reasonably determined that Gross received "medical advice, diagnosis, care or treatment" for these conditions "within the six-month period immediately before" her coverage under the Plan commenced on November 6, 2017. AR 342. In a certification form dated June 27, 2018, Dr. Austin recorded that he had treated Gross for these conditions on multiple dates in June, July, August, and September 2017. AR 1327. And the administrative record contains medical records verifying these treatment dates. *See* AR 721–22 (June 27 right-knee replacement surgery); AR 759–60 (July 11 follow-up examination); AR 661 (July 19 x-ray); AR 761–65 (July 20 incision examination and prescription refill); AR 667–68, 766–68 (August 3 follow-up examination); AR 769–71 (August 25 follow-up examination); and AR 772–75 (September 6 examination to address ongoing pain and incision issues).

Gross disputes the reasonableness of Sedgwick's determination of the cause of Gross's disability—*i.e.*, that her disability was "due to complaints of bilateral knee pain status post bilateral knee arthroplasties," AR 542—and she advances two arguments in support of her position.[8] First, Gross argues that a more specific condition—osteolysis—caused her to become disabled. *See* AR 1474–75; Pl.'s Mem. in Supp. at 8–11. Gross points out that she was not diagnosed with, or treated for, this condition during the look-back period. Pl.'s Mem. in Supp. at 8–9 (citing AR 664). To support this argument, Gross relies on non-binding precedent from the Fifth and Third Circuits holding (according to

---

[8]   Gross does not dispute that she received treatment for these conditions during the look-back period. Therefore, if Sedgwick's determination of the cause of Gross's disability was reasonable, that is the end of the matter.

Gross) that a disability or health benefits claim should not be denied on the basis of a preexisting condition limitation if the disability-causing condition did not exist or was unknown during the look-back period. *Id.* at 10 (citing *Smith v. United Omaha Life Ins. Co.*, 776 Fed. App'x 825 (5th Cir. 2019); *Lawson v. Fortis Ins. Co.*, 301 F.3d 159 (3d Cir. 2002); and *Ross v. Western Fid. Ins. Co.*, 881 F.2d 142 (5th Cir. 1989)). Second, Gross argues that Sedgwick's decision is contradicted by Dr. Marwin's review. Pl.'s Mem. in Supp. at 11–13. Neither of these arguments is persuasive.

As a factual matter, it was reasonable for Sedgwick not to accept Gross's assertion that osteolysis alone caused her disability. As noted, that's not how Gross or Dr. Austin described the cause of her disability. They described the cause as bilateral knee pain associated with Gross's knee-replacement surgeries. *See* AR 1140, 1302, 1304. Gross does not address this evidence. Though it is true that Gross was examined for osteolysis before her disability leave, AR 666, she was not diagnosed with the condition until August 2018, roughly two months after her leave began, AR 664. Gross has not explained why the only reasonable conclusion Sedgwick could have reached is that osteolysis alone caused her disability even after she was diagnosed with the condition. Importantly, Dr. Austin did not separate Gross's osteolysis from his original diagnosis. In a December 14, 2018 form that Dr. Austin submitted in connection with Gross's claim, he identified the revision surgery prompted by osteolysis as his then "primary diagnosis," but indicated that he had treated Gross for "this impairment" on June 27, 2017, the date of Gross's right-knee replacement surgery. AR 1220. To summarize, the record evidence regarding Gross's osteolysis diagnosis and treatment does not call into dispute the reasonableness of

Sedgwick's determination that Gross's disability was caused more generally by knee pain associated with her prior arthroplasty surgery and the presence of her artificial knee.

The cases Gross cites do not support her position. *Lawson* and *Ross* involved state-law claims for breach of contract and bad faith; these cases were adjudicated without the deferential review ERISA requires here. *Lawson*, 301 F.3d at 161–62; *Ross v. Western Fid. Ins. Co.*, 872 F.2d 665, 667 (5th Cir. 1989), *rehearing granted*, 881 F.2d at 144. *Smith* involved a claim for long-term disability benefits under an ERISA plan, but it addressed materially different facts. There, the parties agreed that metastatic ovarian cancer caused the plaintiff's disability and that this cancer had not been diagnosed until after the look-back period had ended. *Smith*, 776 Fed. App'x at 827. The administrator argued nonetheless that the "claim was properly denied [because] medical records show[ed] that [the plaintiff] received treatment during the look-back period for a recurrent right pleural effusion, which was a symptom of the ovarian cancer." *Id.* The court rejected this argument, reasoning:

> Although it is undisputed that [the plaintiff's] pleural effusion was caused by the metastatic ovarian cancer, pleural effusion can be caused by any number of conditions, her symptoms were non-specific to metastatic ovarian cancer, and the medical records do not indicate that her medical providers believed the pleural effusion was likely caused by metastatic ovarian cancer.

*Id.* at 828. Gross's claim is different. Sedgwick did not deny Gross's claim based on evidence that she was treated during the look-back period for symptoms of a not-yet-diagnosed disabling condition. Sedgwick denied Gross's claim because she was treated

during the look-back period for the same conditions she and her treating physician identified to be disabling.

Dr. Marwin's report does not contradict or cast doubt on the reasonableness of Sedgwick's decision. Sedgwick asked the question, but Dr. Marwin offered no opinion as to whether Gross was disabled due to a preexisting condition. AR 561. It is true that Dr. Marwin noted that "the reason for [Gross's] revision [surgery] was not noted until 8/2/18," and it seems implicit that "the reason" Dr. Marwin identified for the revision surgery was osteolysis. AR 561. But Dr. Marwin did not conclude that osteolysis was the cause of Gross's disability. *See generally* AR 558–62. He concluded only that Gross was not disabled between February 18, 2019 and April 22, 2019. AR 559–61. Though Sedgwick quoted from Dr. Marwin's review in its final denial letter, it quoted almost entirely those parts of Dr. Marwin's review that summarized Gross's medical history during the look-back period and the twelve months following her effective date of coverage under the Plan. As explained, *supra* at 2, n.3, Sedgwick did not accept Dr. Marwin's conclusion that Gross was not disabled as a reason to deny her claim. AR 542. Sedgwick denied the claim only on the basis of the preexisting condition limitation, and Dr. Marwin's summary of Gross's medical history informed this decision. *Id.* Gross does not argue that Sedgwick abused its discretion by denying her claim without a medical expert weighing in on the preexisting-condition issue. Regardless, an expert medical opinion seems unnecessary to justify the reasonableness of Sedgwick's decision. Gross's physicians consistently have tied the cause of her disability to treatment provided during the look-back period. *E.g.*, AR 1220, 1327. The record is extensive and "document[s] [Gross's] physical condition during all

relevant times." *Marshall v. UNUM Life Ins. Co.*, 13 F.3d 282, 284 (8th Cir. 1994). Gross's medical issues and symptoms do not present complex diagnostic or causation questions. *Id.* at 285. And Gross did not submit an expert medical opinion to support her claim.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    Plaintiff Bridget Gross's Motion for Summary Judgment [ECF No. 19] is **DENIED**.

2.    Defendant Eaton Corporation's Motion for Summary Judgment [ECF No. 24] is **GRANTED**.

## LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  November 12, 2020

s/ Eric C. Tostrud
Eric C. Tostrud
United States District Court